UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Soscia Holdings, LLC

      v.                                                     Civil No. 22-cv-266-LM
                                                            Opinion No. 2023 DNH 074 P
State of Rhode Island, et al.

**O R D E R**

Soscia Holdings, LLC, brings federal and state claims against the State of Rhode Island, the Rhode Island Department of Environmental Management ("DEM"), DEM Director Terrence Gray, and Administrator of DEM Office of Compliance and Inspection David E. Chopy. Soscia's claims arise from its operation of the Flat River Reservoir Dam ("Dam") in Coventry, Rhode Island. DEM sent letters to Soscia under a law requiring permits for certain dams, Rhode Island General Laws § 46-19.1-1 ("Permitting Act"), directing Soscia to reduce the water flow from the Dam in order to raise the water level in the reservoir created by the Dam.

Soscia alleges that the Permitting Act is unconstitutional and challenges the defendants' actions to enforce it. Soscia brings a claim under the Rhode Island Constitution and federal claims under 42 U.S.C. § 1983 against Rhode Island, DEM, Chopy, and Gray and brings state law tort claims against Chopy and Gray. Defendants move to dismiss based on Eleventh Amendment sovereign immunity, qualified immunity, abstention principles, and failure to state a cognizable claim.

For the following reasons, the court dismisses all claims brought against the State of Rhode Island and DEM, the claim brought under the Rhode Island Constitution, and the § 1983 claims against Chopy and Gray in their individual capacities. The court does not dismiss the § 1983 claims against Chopy and Gray in their official capacities, seeking only prospective injunctive relief.

With jurisdictional and quasi-jurisdictional issues resolved, the court has substantially narrowed Soscia's federal claims. The court find that this is an appropriate point to reassess the merits of the remaining claims. The court, therefore, denies without prejudice that part of the motion seeking dismissal of the claims on the merits. Defendants may address the merits of the remaining claims either in a subsequent and newly-briefed motion to dismiss or in a motion for summary judgment.

## STANDARD OF REVIEW

Eleventh Amendment sovereign immunity implicates the court's jurisdiction, which the court addresses under Federal Rule of Civil Procedure 12(b)(1).[1] Motions to dismiss under Rule 12(b)(1) may be facial or factual, depending on whether the

---

[1] Defendants also cite Federal Rule of Civil Procedure 12(b)(2), which pertains to personal jurisdiction. Doc. no. 34-1 at 7. The First Circuit has recognized the hybrid nature of Eleventh Amendment sovereign immunity, which has similarities to both subject matter and personal jurisdiction. Maysonet-Robles v. Cabrero, 323 F.3d 43, 50 (1st Cir. 2003). The court need not address that issue here, however, because defendants make no developed argument of sovereign immunity in the context of personal jurisdiction. See Valentin v. Hosp. Bella Vista, 254 F.3d 358, 362-63 (1st Cir. 2001) (stating that the "proper vehicle for challenging subject-matter jurisdiction, including on the ground of sovereign immunity, is Federal Rule of Civil Procedure 12(b)(1)); Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995) (same).

2

motion is based on the complaint alone or is supported by evidence. Laufer v. Acheson Hotels, LLC, 50 F.4th 259, 265 (1st Cir. 2022). When, as here, defendants present a facial challenge, the court takes the properly pleaded facts in the complaint as true and follows the standard used under Federal Rule of Civil Procedure 12(b)(6). Id. The party invoking the court's jurisdiction, here the plaintiff, bears the burden of showing that jurisdiction exists. Aversa v. United States, 99 F.3d 1200, 1211 (1st Cir. 1996).

Under Rule 12(b)(6), the court asks whether the plaintiff has made allegations in its pleadings that are sufficient to render its entitlement to relief plausible. See Manning v. Boston Med. Ctr. Corp., 725 F.3d 34, 43 (1st Cir. 2013). The court accepts all well-pleaded facts as true and draws all reasonable inferences in the non-moving party's favor. Hamann v. Carpenter, 937 F.3d 86, 88 (1st Cir. 2019). The court, however, disregards "statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." Sonoiki v. Harvard Univ., 37 F.4th 691, 703 (1st Cir. 2022) (internal quotation marks omitted). In addition to the allegations in the complaint, the court may consider exhibits submitted with the complaint, official public records, and documents whose authenticity is not disputed. Douglas v. Hirshon, 63 F.4th 49, 57 (1st Cir. 2023).

## BACKGROUND

On January 24, 2023, the court held a hearing on defendants' motion to dismiss (doc. no. 34) and Soscia's motion for a preliminary injunction (doc. no. 5).

3

The court denied Soscia's motion for a preliminary injunction due to a lack of irreparable harm and took defendants' motion to dismiss under advisement.

I.      The 1846 Act

The story behind this case began in 1846 when certain owners of mills and real estate in Coventry, Rhode Island, petitioned the Rhode Island General Assembly to pass an act of incorporation for the "Quidnick Reservoir Company."[2] Doc. no. 32-3 at 4. The purpose of the corporation was to build dams and reservoirs on the Pawtuxet River to supply water for their mills. The General Assembly passed "An Act to Incorporate the Quidnick Reservoir Company" ("1846 Act"):

> for the purpose of erecting, establishing, maintaining and keeping in order dams and reservoirs on the waters of said Pawtuxet River and its branches; and by that name are and forever hereafter shall be able and capable in law to hold, purchase, receive, possess, enjoy and retain to themselves and their successors, lands, rents, tenements, goods, chattels and effects of what kind or nature soever.

Id. at 8. Once incorporated, the Quidnick Reservoir Company built the Dam on the Pawtuxet River that created the Flat River Reservoir, known as Johnson's Pond.[3]

The Rhode Island General Assembly amended the 1846 Act in 1867, 1975, and 1982. As part of the 1982 amendment, the stated purposes of the Quidnick

---

[2] The Quidnick name apparently was used because Quidnick Pond was located in the area. Doc. no. 32-3 at 4.

[3] The parties have not explained the references to both the Flat River and the Pawtuxet River. The explanation may be as follows: The Flat River "is formed in Coventry by the confluence of Sawmill and Pine swamp brooks. The river flows east to converge with the Big River to form the South Branch Pawtuxet River in the area now flooded by the Flat River Reservoir." Flat River (South Branch Pawtuxet River tributary) - Wikipedia (last visited June 9, 2023).

Reservoir Company were: "to erect and establish dams and reservoirs for the rentention [sic] and preservation of the waters of the Pawtuxet River and its branches for the benefit of its members; for establishment and operation of hydro power sites for its members' uses and resale of power generated therefrom; and any other legal purposes." Id. at 20. Section 2 of the 1846 Act, as amended in 1982, provides that "Quidnick Reservoir Company shall enjoy the other powers generally incident to corporations and shall be subject to the provisions of Title 7 of the General Laws of Rhode Island of 1956, as amended, and all acts in amendment thereof and in addition thereto."[4] Id. at 23.

II.     The Coventry Lease

In January 2009, the Town of Coventry, where the Dam is located, leased Johnson's Pond and a vacant parcel of land, referred to as Open Space, from Quidnick Reservoir Company ("Coventry Lease").[5] Under the terms of the Coventry Lease, Quidnick agreed to maintain the water level in Johnson's Pond according to the "Water Level Table," which is Section 7 of the Lease. The Coventry Lease will expire on March 31, 2024.

---

[4] Title 7 governs corporations, associations, and partnerships.

[5] Soscia states in its objection to the motion to dismiss that Coventry leased the recreation rights to Johnson's Pond from Quidnick beginning in 1982.

III.    Sale to Soscia

In March 2020, Quidnick sold "two parcels of land and water rights" to Soscia through a purchase and sale agreement (doc. no. 32-1) and a quitclaim deed (doc. no. 32-2 at 14-16).  Quidnick took a mortgage on the property for $1,500,000.00 and assigned its rents and leases of the property to Soscia.  Doc. no. 32-2 at 2-3.  Parcel I of the two parcels of property Quidnick sold is described by its boundaries in the deed and included approximately 100 acres of land on Flat River Road in Coventry. Id. at 2 & 15-16.  Parcel II is described as "land and water rights commonly known as Johnson's Pond, Coventry, Rhode Island."  Parcel II is also described as follows.

> Also specifically including in this conveyance any and all right held by Quidnick Reservoir Company to cover and flow with water all or so much of any such lands as shall be consequent upon and caused by the erection and maintenance of any dam on the Flat River within the Town of Coventry, and including and hereby conveying any and all rights that Quidnick Reservoir Company has or has any claim to in any waters within the Town of Coventry, including but not limited to Flat River Reservoir or Johnson's Pond so-called[.]

> It is the purpose and intent of this Deed to convey, and Quidnick Reservoir Company hereby does convey, to Soscia Holdings LLC all the right, title, claim and interest that Quidnick Reservoir Company has in and to any and all land in the Town of Conventry, and any and all rights, title, claims and interest that Quidnick Reservoir Company has in the waters or submerged lands within the Town of Coventry, including but not limited to the Flat River Reservoir and Johnson's Pond, and all flowage rights, dams, flumes, raceways and other apparatus or equipment used in connection therewith.

6

Id. at 16.  Quidnick assigned its interest in the Coventry Lease to Soscia.  Doc. no.

32-5.  After the sale and assignment of the Coventry Lease, Soscia sued Coventry in

state court seeking a declaration related to the terms of the Lease.[6]

IV.     Water levels in Johnson's Pond

At some point after purchasing the property from Quidnick, Soscia increased

the water flow through the Dam, lowering the water level in Johnson's Pond below

its customary level.  The lowered water level exposed muddy banks along the Pond

and decreased the depth of the Pond.  In April 2021, David Chopy, Administrator of

the DEM Office of Compliance and Inspection, sent letters to Soscia and Coventry

about water levels in Johnson's Pond, notifying them that Soscia would need a

permit to operate the Dam with water levels other than those stated in the lease

with Coventry.  Chopy also communicated with the United States Geologic Survey-

Water Mission Area in November 2021 about the need for certain flow in the

Pawtuxet River related to grass or weed growth.  Doc. no. 32-7.

V.      Permitting Act

The Rhode Island General Assembly passed the Permitting Act, which

became effective in June 2022.  The Permitting Act requires permits for dams with

certain water retention capacity, which includes the Dam at issue in this case.  R.I.

Gen. Laws § 46-19.1-1.  Under the Act, the owner or operator of a dam above a

---

[6] The defendants state in their brief that Soscia brought suit against DEM in state court, Soscia v. RIDEM, P.C.-2021-07254, but did not provide a copy of the complaint or any specific information about that case.  Doc. no. 34-1 at 18.

7

certain water capacity must apply to the director of DEM for a permit to raise or lower the water level behind the dam. Until a permit is issued under the Act, the owner or operator must operate the dam in a way that is consistent with the historic use as to water level and streamflow.[7] The director of DEM may enforce the Permitting Act under Rhode Island General Laws § 42-17.6, which provides for monetary penalties.

On July 11, 2022, Chopy sent Soscia a letter, notifying it that the Dam was governed by the Permitting Act. Doc. no. 32-7. Chopy included information about the amounts of water flow through the Dam in the past, which is measured in cubic feet per second ("cfs") at different times during the year.[8] Chopy stated that if DEM determined that the Dam was not being operated according to its historic use, DEM was authorized to fine Scoscia up to $1,000.00 per day for each day of noncompliance. Chopy explained that DEM's inspection of the Dam in June and July showed that its waterflow was inconsistent with its historic use. Chopy stated that Soscia must reduce the flow to allow the level of water in Johnson's Pond to

---

[7] During the hearing, counsel for the defendants explained that the permitting process will not begin until DEM enacts regulations for that purpose. It is not clear to the court whether a permitting process is in place.

[8] Earlier correspondence from DEM to Soscia and Coventry, which is included in Exhibit 7 to the Second Amended Complaint, references a Consent Agreement between Quidnick and DEM in 1995 in which Quidnick agreed to certain water levels and water releases to resolve a Notice of Violation from DEM. The same water levels and water releases were incorporated into the Coventry Lease. The Consent Agreement was submitted as part of Exhibit 9 to the Second Amended Complaint.

rise to the "spillway level" and that the streamflow in the South Pawtuxet River must be reduced from 40 cfs to 24 cfs.  Id. at 3.

Two days later, on July 13, 2022, Chopy sent a second letter to Soscia that reviewed the elements of the Permitting Act and stated that Soscia's operation of the Dam was not consistent with historic use as to water flow through the Dam. Doc. no. 32-8.  Chopy ordered Soscia to cease and desist from operating the Dam in a manner that was inconsistent with its historic use and to immediately reduce the flow to 24 cfs.  The letter noted the monetary penalty for failure to comply and required Soscia to notify DEM in writing within five days of its intent to comply with the Cease and Desist Order.

VI.    Procedural background

Shortly after receiving the Cease and Desist Order, Soscia filed the complaint in this case on July 18 against the State of Rhode Island, DEM, and Gray, alleging federal claims for constitutional violations under 42 U.S.C. § 1983 and state law claims for intentional interference with contractual rights.  Nine days later, Soscia filed an amended complaint against the same defendants but added a § 1983 claim for violation of the Contracts Clause in Article 1, § 10 of the United States Constitution and a claim for violation of the Rhode Island Constitution.  Soscia moved for a temporary restraining order and a preliminary injunction against

9

defendants' enforcement of the Permitting Act.  Doc. no. 5.  On July 29, 2022, the court denied the part of the motion seeking a temporary injunction.[9]

Soscia filed a second amended complaint on September 13, 2022.  Doc. no. 30. Two weeks later, Soscia filed a third amended complaint, which is the operative complaint in the case and includes 9 exhibits.  Doc. no. 32.  In the third amended complaint, Soscia names the State of Rhode Island, DEM, Chopy, and Gray as defendants and alleges the following claims:

Count I - § 1983 – Soscia alleges that by enacting the Permitting Act and issuing the Cease and Desist Order defendants impaired Soscia's contract rights with Rhode Island in violation of the Contract Clause of Article 1, § 10 of the United States Constitution, and seeks a declaratory judgment, a permanent injunction, compensatory and punitive damages, and attorney fees and costs.

Count II - § 1983 – Soscia alleges that the Permitting Act constitutes a taking by Rhode Island of the rights Soscia acquired from Quidnick in violation of the Takings Clause of the Fifth Amendment and seeks a declaratory judgment, a permanent injunction, compensatory and punitive damages, and attorney fees and costs.

---

[9] On August 9, 2022, Terrence Gray, the Director of DEM, sent Soscia an "Immediate Compliance Order."  Doc. no. 32-9.  In the Compliance Order, Gray provided background facts about the issues with the Dam, listed Soscia's violations of the Permitting Act and Rhode Island's water quality regulations, and required immediate compliance.  The Compliance Order was effective for 45 days with a possible renewal of 45 days.  Even if the Compliance Order were renewed for 45 days (and there is no indication of renewal), it has now expired.

10

Count III - § 1983 – Soscia alleges that by sending the Cease and Desist Order without providing an opportunity for Soscia to be heard, defendants deprived it of procedural due process under the Due Process Clause of the Fifth and Fourteenth Amendments and violated the Equal Protection Clause of the Fourteenth Amendment and seeks a declaratory judgment, a permanent injunction, compensatory and punitive damages, and attorney fees and costs.

Count IV - § 1983 – Soscia alleges that by controlling the water levels in Johnson's Pond and applying the Permitting Act to Soscia, defendants violated the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments and seeks a declaratory judgment, a permanent injunction, compensatory and punitive damages, and attorney fees and costs.

Count V – state law – Soscia alleges that Chopy and Gray intentionally interfered with the Coventry Lease and seeks damages and attorney fees.

Count VI – state law – Soscia alleges that the Permitting Act and actions by DEM before the Act was passed constitute intentional interference with Soscia's contract rights under the "franchise contract" with Rhode Island and seeks damages and attorney fees.

Count VII – state law – Soscia alleges that by enacting the Permitting Act and issuing the Cease and Desist Order defendants violated Article 1, § 12 of the Rhode Island Constitution and seeks a declaratory judgment and a permanent injunction.

**DISCUSSION**

Defendants move to dismiss the § 1983 claims and the claim under the Rhode Island Constitution based on Eleventh Amendment sovereign immunity. They move to dismiss the § 1983 claims against Chopy and Gray in their individual capacities based on qualified immunity. Defendants challenge all of the claims based on abstention principles. Soscia objects to the motion, arguing that defendants are not entitled to sovereign immunity, that it can maintain its § 1983 claims against Chopy and Gray for damages and prospective injunctive relief, and that abstention principles do not apply. The court addresses sovereign immunity first, followed by qualified immunity, and then abstention.

I.      Sovereign Immunity - § 1983 Claims

Rhode Island, DEM, and Chopy and Gray in their official capacities assert that sovereign immunity under the Eleventh Amendment requires dismissal of Soscia's federal claims (Counts I-IV). Soscia's § 1983 claims seek declaratory judgment, injunctive relief, and compensatory and punitive damages against Rhode Island, DEM, and Chopy and Gray (in their official capacities ).[10] In response, Soscia argues that exceptions apply to allow its § 1983 claims.

---

[10] Defendants acknowledge that Rhode Island has consented to suit and waived sovereign immunity for tort claims pursuant to Rhode Island General Laws § 9-31-1 but argue that the statute does not cover the claims alleged in this case. Soscia does not raise § 9-31-1 as a waiver by the state of its sovereign immunity as to any claim in this case. See Luceus v. Rhode Island, 2016 WL 7971311, at *5 (D.R.I. Dec. 13, 2016) (discussing waiver of sovereign immunity under § 9-31-1 and citing Marapese v. State of R.I., 500 F. Supp. 1207 (D.R.I. 1980), that held that the state consented to suit for § 1983 claims that were "in the nature of tort at common law"). Because

12

Section 1983 provides a federal cause of action against "[e]very person" who deprives another person "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "Basic tenets of sovereign immunity teach that courts may not ordinarily hear a suit brought by any person against a nonconsenting State." Torres v. Texas Dept. of Public Safety, 142 S. Ct. 2455, 2461-62 (2022); Will v. Mich. Dept. of State Police, 491 U.S. 58, 71 (1989). For that reason, states (including their departments and agencies), and state officials sued for money damages in their official capacities are not "persons" within the meaning of § 1983. Will, 491 U.S. at 71. Eleventh Amendment sovereign immunity bars claims seeking money damages against a state, a state agency, or a state official sued in his official capacity in federal court. Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004). Nevertheless, there are limited recognized circumstances in which a state may be subject to suit, including when the state consents, when congress abrogates immunity, and when the Ex parte Young doctrine applies. See PennEast Pipeline Co., LLC v. New Jersey, 141 S. Ct. 2244, 2258 (2021); Reed v. Goertz, 143 S. Ct. 955, 960 (2023).

A defendant who asserts sovereign immunity bears the burden to show that it is an arm of the state. Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & Caribbean Cardiovascular Ctr. Corp., 322 F.3d 56, 61 (1st Cir. 2003). Once that showing is made, the plaintiff bears the burden to show that an exception to

Soscia does not press § 9-31-1 as a waiver of sovereign immunity, the court will not address it further.

13

sovereign immunity applies. See Allen v. Cooper, 895 F.3d 337, 354 (4th Cir. 2018); Mallison v. Conn. Office of Early Childhood, --- F. Supp. 3d ---, 2023 WL 2139510, at *3 (D. Conn. Feb. 21, 2023).

There is no dispute that Eleventh Amendment sovereign immunity applies to the State of Rhode Island. Soscia also does not dispute that DEM, Gray, and Chopy in their official capacities are arms of the State of Rhode Island for purposes of sovereign immunity. Soscia does not argue that any of the defendants consented to suit or that congress abrogated sovereign immunity with respect to his claims. Therefore, absent another applicable exception to sovereign immunity, Soscia's § 1983 claims must be dismissed.

Soscia raises three exceptions to sovereign immunity in this case. The first two asserted exceptions are based on novel theories and the third is conventional. Soscia first contends that sovereign immunity does not apply to its Contract Clause claim (Count I) or its Takings Clause claim (Count II) because under Rhode Island law it would not be entitled to a remedy in Rhode Island courts. Soscia's second theory is that the United States Supreme Court created an exception to sovereign immunity in Knick v. Township of Scott, Pennsylvania, 139 S. Ct. 2162 (2019). And third, Soscia argues that it can maintain constitutional claims under § 1983 for prospective injunctive relief pursuant to the exception to sovereign immunity provided by Ex parte Young, 209 U.S. 123, 159–161 (1908). Defendants contend that none of these asserted exceptions applies.

14

A.    Constitutional requirement of remedy

Soscia first contends that there is an exception to Eleventh Amendment sovereign immunity for a takings claim where a state court does not provide a plaintiff with a remedy.[11]  In so arguing, Soscia relies on Hutto v. South Carolina Retirement System, 773 F.3d 536 (4th Cir. 2014).  In Hutto, the Fourth Circuit held that the Eleventh Amendment bars Fifth Amendment Takings Clause claims against states in federal court "when the State's courts remain open to adjudicate such claims."  Id. at 552.  The issue in Hutto was whether the Fifth Amendment's requirement of just compensation for a governmental taking precluded sovereign immunity in federal court.  Id. at 551.  The Fourth Circuit stated that because South Carolina courts "have long recognized a right of persons to sue the State for unconstitutional takings," the Fifth Amendment's requirement of just compensation for a taking did not preclude the defense of sovereign immunity in federal court.  Id.

Importantly, however, the Fourth Circuit further stated that "we do not decide the question whether a State can close its doors to a takings claim or the question whether the Eleventh Amendment would ban a takings claim in federal court if the State courts were to refuse to hear such a claim."  Id.  As such, Hutto

---

[11] Soscia also cites Count I, the Contract Clause claim, for purposes of a remedy exception to sovereign immunity but makes no developed argument of how or why that theory applies to the Contract Clause claim.  For that reason, the court deems the remedy exception argument waived as to Count I and focuses on Soscia's theory in the context of the Takings Clause claim in Count II.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

does not stand for the proposition that the lack of a remedy for a takings claim in state court provides an exception to sovereign immunity in federal court.

In any event, Soscia is incorrect about the underlying premise: that Rhode Island courts would not hear its takings claim. On the contrary, Rhode Island courts are "open" to takings claims, including claims against DEM. In Alegria v. Keeney, 687 A.2d 1249 (R.I. 1999), the plaintiff bought a 28-acre parcel of land for development, although the parcel was 80% wetlands. Id. at 1250. DEM denied plaintiff's application for construction of residences and industrial buildings on the property as being "inconsistent with the public interest and public policy" as provided in the Rhode Island Freshwater Wetlands Act. Id. After plaintiff's appeals were denied, he brought suit in Rhode Island state court, alleging that DEM's enforcement of the Act constituted a taking of his property in violation of the Fifth Amendment and the Rhode Island Constitution. Id. at 1251-52. The trial court dismissed the case, finding that plaintiff knew the property included wetlands when he purchased it and that plaintiff was not entitled to compensation for his error of judgment. Id. at 1251. On appeal the Rhode Island Supreme Court affirmed and concluded that the takings claim failed in that case. Id. at 1254-55. See also Marek v. Rhode Island, 792 F.3d 650, 654 (1st Cir. 2012) ("Rhode Island courts recognize a cause of action for inverse condemnation, allowing for recovery when a governmental entity exercising land use restrictions or regulations effectively takes property without formally exercising its eminent domain power."). Although plaintiff's takings claim in Alegria failed, it was heard and decided on the

16

merits. Neither the trial court nor the Rhode Island Supreme Court rejected the takings claim based on the provisions in the Rhode Island Constitution that Soscia argues would preclude its takings claim in Rhode Island courts. Soscia has not therefore shown that its takings claim would be barred in Rhode Island courts.

In short, Soscia's theory about the lack of a remedy for its takings claim in Rhode Island's courts fails to defeat the doctrine of sovereign immunity.

B.     Knick and sovereign immunity

Soscia next argues that the United States Supreme Court created an exception to the sovereign immunity doctrine for Takings Clause claims in Knick v. Township of Scott, Pennsylvania. 139 S. Ct. at 2167-68. The Supreme Court did not address the doctrine of sovereign immunity in Knick. Instead, the Court analyzed whether a plaintiff must exhaust post-taking remedies before bringing a Fifth Amendment takings claim. Id. The Court concluded, contrary to Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City, 473 U.S. 172 (1985), that "[t]he Fifth Amendment right to full compensation arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner." Id. at 2170. The takings claim in Knick was brought against a municipality, not the state, and for that reason the Supreme Court did not address sovereign immunity. See Pharm. Research & Mfrs. of Am. v. Williams, 64 F.4th 932, 949 n.13 (8th Cir. 2023); Zito v. N.C. Coastal Resources Comm'n, 8 F.4th 281, 286 (4th Cir. 2021); Ladd v. Marchbanks, 971 F.3d 574, 579-80 (6th Cir. 2020).

17

In every case where the plaintiff has argued, as Soscia does here, that takings claims are not subject to sovereign immunity pursuant to Knick, courts have ruled against the plaintiff. See, e.g., Skatemore, Inc. v. Whitmer, 40 F.4th 727, 733-34 (6th Cir. 2022) (reiterating the holding in Ladd, 971 F.3d at 579-80, that Knick did not provide an exception to sovereign immunity for takings claims); Pavlock v. Holcomb, 35 F.4th 581, 589 (7th Cir. 2022) ("Every circuit to consider the question has held that Knick did not change states' sovereign immunity from takings claims for damages in federal court, so long as state courts remain open to those claims."); Gerlach v. Rokita, No. 22-cv-072-TWP-MG, 2023 WL 2683132, at *8-*9 (S.D. Ind. Mar. 29, 2023); Blueprint Capital Advisors, LLC v. Murphy, No. 20-cv-07663 (JXN) (ESK), 2022 WL 17887229, at *20 (D.N.J. Dec. 23, 2023); see also Merritts v. Richards, 62 F.4th 764, 772 (3d Cir. 2023) (affirming dismissal of takings claim based on sovereign immunity but remanding to have dismissal be entered without prejudice).[12]

For these reasons, the court finds that the holding in Knick does not affect the application of sovereign immunity to Soscia's takings claim, Count II.

---

[12] Soscia relies on two district court cases to support its argument that Knick created or recognized an exception to sovereign immunity for takings claims. The court is not persuaded by Allen v. Cooper, 555 F. Supp. 3d 226, 238-39 (E.D.N.C. 2021), to disregard the weight of authority to the contrary. And Donnelly v. Maryland, 602 F. Supp. 3d 836, 855 (D. Md. 2022), does not support Soscia's theory. In Donnelly, the court followed Fourth Circuit precedent, see Zito v. N.C. Coastal Resources Comm'n, 8 F.4th 281, 286-87 (4th Cir. 2021), that held Knick did not abrogate sovereign immunity in federal court.

C.	Prospective injunctive relief - Ex parte Young

Finally, Soscia contends that sovereign immunity does not apply to the extent it is seeking prospective injunctive relief from Chopy and Gray.   Under the Ex parte Young doctrine, plaintiffs may "seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law." Whole Woman's Health v. Jackson, 142 S. Ct. 522, 532 (2022); accord Reed v. Goertz, 143 S. Ct. 955, 960 (2023).   Such claims are not barred by Eleventh Amendment sovereign immunity "because a suit challenging the constitutionality of a state official's action in enforcing state law is not one against the State."  Doe v. Shibinette, 16 F.4th 894, 903 (1st Cir. 2021) (internal quotation marks omitted). "'In determining whether the doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"  Id. (quoting Verizon Md., Inc. v. Pub. Serv. Comm'n, 535 U.S. 635, 645 (2002) (further internal quotation marks omitted).

In Counts I through IV, Soscia seeks, among other things, injunctive relief against Chopy and Gray in their official capacities at DEM to stop enforcement of the Permitting Act going forward.  While Soscia relies on the letters sent by Chopy and Gray last summer to show interference or potential interference with Soscia's property and water rights, the complaint seeks prospective injunctive relief to stop Chopy and Gray from interfering with those rights by enforcing the Permitting Act in the future.  To the extent Soscia seeks prospective injunctive relief against Chopy

19

and Gray, Soscia is correct that these claims fall within the Ex parte Young exception.

Defendants contend, however, relying on Ladd v. Marchbanks, 971 F.3d 574, 581 (6th Cir. 2020), that Soscia is actually seeking compensation, not injunctive relief. In Ladd, the Sixth Circuit held that the plaintiff's claim was not within the exception provided by the Ex parte Young doctrine because the plaintiff was seeking compensation from Ohio with respect to damage to property that had already occurred. Unlike the claim in Ladd, however, Soscia's claims can be limited to preventing future harm. That is, Soscia's claims survive to the extent Soscia is seeking an injunction to avoid enforcement of the Permitting Act in the future. To the extent Soscia is seeking a remedy for harms in the past, those claims are barred by sovereign immunity.

For these reasons, sovereign immunity does not bar Soscia's claims in Counts I, II, III, and IV against Chopy and Gray in their official capacities to the extent those claims seek prospective injunctive relief to prohibit future enforcement of the Permitting Act.

II.     Sovereign Immunity – Rhode Island Constitution Claim

In Count VII, Soscia seeks a declaratory judgment that defendants violated Article I, § 12 of the Rhode Island Constitution by "enactment" of the Permitting Act and by issuing the Cease and Desist Order in July 2022. Doc. no. 32 at 16, ¶ 67. That section of the Rhode Island Constitution provides: "No ex post facto law, or law impairing the obligation of contracts, shall be passed." R.I. Const., Art. I, § 12.

20

Defendants move to dismiss Count VII on the basis of sovereign immunity. Soscia does not appear to have responded to that part of the motion.

The Eleventh Amendment precludes federal courts from deciding claims that allege a state official has violated state law. Pennhurst St. Sch. & Hosp. v. Halderman, 465 U.S. 89, 102 (1984). "It is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." Id. Therefore, Eleventh Amendment sovereign immunity bars Count VII, which is dismissed.

III.    Qualified immunity

Soscia also brings § 1983 claims against Chopy and Gray in their individual capacities, challenging their efforts to enforce the Permitting Act. Defendants contend that Soscia's § 1983 claims against Chopy and Gray in their individual capacities must be dismissed based on qualified immunity. Soscia argues that qualified immunity does not protect Chopy and Gray because the constitutional rights it asserts were clearly established when Chopy and Gray sent the letters last summer to enforce the Permitting Act.

"When government officials are sued in their individual capacities for money damages, the doctrine of qualified immunity shields them from pecuniary liability unless their conduct violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Lawless v. Town of Freetown, 63 F.4th 61, 67 (1st Cir. 2023) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). Qualified immunity applies where: (1) a federal right was violated, and (2) "the

21

unlawfulness of the conduct was clearly established at the time." Lawless, 63 F.4th at 67. Courts may begin the qualified immunity analysis by considering the clearly established prong. Id.

For purposes of the clearly established prong, the court must decide the following: "(1) the relative clarity of the governing law to a reasonable official on the date of the alleged wrong and (2) whether the specific characteristics of the situation confronted by the official would have made it clear to a reasonable official how the governing law applied in the given situation." Id. The governing law must be so clear as to put "the statutory or constitutional question beyond debate" because officials may "make reasonable but mistaken judgments." City & Cnty. of San Francisco v. Sheehan, 575 U.S. 600, 611 (2015). Qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" Id. (quoting Aschcroft v. al-Kidd, 563 U.S. 731, 743 (2011)). The plaintiff bears the burden to demonstrate that the law was clearly established. Est. of Rahim by Rahim v. Doe, 51 F.4th 402, 410 (1st Cir. 2022).

To satisfy the clearly established prong, Soscia relies on the 1846 Act, the Ronci case, and the Mill Dam Act. None of these establishes this prong.

A.      1846 Act

Soscia argues that the 1846 Act, which incorporated Quidnick and granted Quidnick certain property and water rights, is clearly established law as to Soscia's right to control the dam and the level of water in Johnson's Pond. To avoid qualified immunity in the context of Soscia's constitutional claims, Soscia must

22

identify controlling authority or a consensus of persuasive cases that would provide a clear signal that the challenged conduct violates a constitutional right.  See Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017).  The 1846 Act does not address any constitutional rights and does not therefore defeat qualified immunity.

### B. Ronci

Soscia argues that Ronci Mfg. Co. v. Rhode Island, 121 R.I. 903, 403 A.2d 1094 (1979), provides clearly established law that defendants enforcement of the Permitting Act violates Soscia's rights under the Takings Clause.  In Ronci, the Rhode Island Supreme Court applied Rhode Island statutory law to decide the plaintiff's petition for damages.  The plaintiff did not raise a federal constitutional right, and no federal right was addressed or decided.  The court's decision in Ronci is based on state law and is unrelated to the federal constitutional claims Soscia brings here.  Soscia's reliance on Ronci to defeat qualitied immunity misses the mark.

### C. Mill Dam Act

Soscia also contends that language in the Mill Dam Act should have put Chopy and Gray on notice that enforcing the Permitting Act would violate its rights.  Soscia's interpretation of the Mill Dam Act is far from clear and was not addressed or decided in Ronci or in any other cited case.  More importantly, nothing in Ronci or the Mill Dam Act provides clearly established law that enforcing the Permitting Act in the circumstances of this case would violate Soscia's federal constitutional rights.

23

For these reasons, Chopy and Gray are entitled to qualified immunity from liability in their individual capacities as to Counts I through IV. The court therefore dismisses the claims in Counts I, II, III, and IV against Chopy and Gray in their individual capacities.

IV.     Abstention

Defendants argue that the court should abstain from considering Soscia's claims based on the principles provided in Burford v. Sun Oil Co., 319 U.S. 315 (1943) ("Burford abstention"), and Railroad Commission of Texas v. Pullman Co., 312 U.S. 496 (1941) ("Pullman abstention"). In support, defendants contend that: Soscia previously abandoned state court litigation on the same facts and issues; Soscia's claims challenging enforcement of the Permitting Act implicate important areas of state environmental law; and Soscia relies on the Mill Dam Act, which also implicates state law. Soscia disagrees.

As is often stated, "'federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress.'" Forty Six Hundred LLC v. Cadence Educ., LLC, 15 F.4th 70, 74 (1st Cir. 2021) (quoting Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996)). Nevertheless, the "Supreme Court has carved out certain 'exceptional circumstances' – circumstances in which 'denying a federal forum would clearly serve an important countervailing interest' – that may warrant a federal court's eschewal of jurisdiction." Id. (quoting Quackenbush, 517 U.S. at 716). The Burford abstention doctrine is one such exception. It applies when a case "'presents difficult questions of state law bearing on policy problems of

substantial public import whose importance transcends the result in the case then at bar, or if its adjudication in a federal forum would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" Id. at 75 (quoting Quackenbush, 517 U.S. at 726-27). The Pullman abstention doctrine is another exception. It applies "where (1) substantial uncertainty exists over the meaning of the state law in question, and (2) settling the question of state law will or may well obviate the need to resolve a significant federal constitutional question." Barr v. Galvin, 626 F.3d 99, 107 (1st Cir. 2010). A district court decision on abstention must address two elements: (1) "whether certain preconditions for abstention are met, and if so," (2) "whether abstention is appropriate." Forty Six Hundred, 15 F.4th at 74.

### A. Burford abstention

Defendants first argue that the court should abstain based on the Burford abstention doctrine because Soscia's claims involve the state's ongoing enforcement action under the Permitting Act and Rhode Island state courts are available to decide the claims. They contend that a "central question" in this case is the meaning of "historic use" in the context of the Permitting Act. Doc. no. 34-1 at 20. Because of the local nature of the dispute, defendants assert that in deciding the claims raised here the court would become a regulatory decision-maker for the State.

"The Burford abstention doctrine applies in the extraordinary circumstance when a case 'presents difficult questions of state law bearing on policy problems of

substantial public import whose importance transcends the result in the case then at bar, or if the adjudication in a federal forum would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" Forty Six Hundred, 15 F.4th at 75 (quoting Quackenbush, 517 U.S. at 726-27).  Burford abstention is intended to prevent federal courts from creating "a parallel, additional, federal 'regulatory review' mechanism, the existence of which would significantly increase the difficulty of administering the state regulatory scheme.'" Id. at 75 (quoting Bath Mem'l Hosp. v. Maine Health Care Fin. Comm'n, 853 F.2d 1007, 1013 (1st Cir. 1988)).  That is, "'[t]he fundamental concern in Burford is to prevent federal courts from bypassing a state administrative scheme and resolving issues of state law and policy that are committed in the first instance to expert administrative resolution.'" Id. (quoting Pub. Serv. Co. of N.H. . Patch, 167 F.3d 15, 24 (1st Cir. 1998)).

Abstention is not justified merely because the claims implicate "important state regulatory policies," because the result "may impair operation of a state administrative scheme or overturn state policy," or because a potential exists for conflict between the federal court decision and state regulatory law or policy.  Id. (internal quotation marks omitted).  For example, in Forty Six Hundred, the district court remanded the case to preserve Massachusetts's statutory scheme applicable to the summary eviction process.  Id. at 73.  The First Circuit reversed, holding that Burford abstention did not apply because the use of the Federal Rules of Civil Procedure in federal court to decide the eviction issue would not interfere in a state

administrative scheme or in state policymaking and that the district court could apply Massachusetts property law to the issues in the case. Id. at 77-78.

The First Circuit considers three factors to address the propriety of Burford abstention: (1) "the availability of timely and adequate state-court review, (2) the potential that federal court jurisdiction over the suit will interfere with state administrative policymaking, and (3) whether conflict with state proceedings can be avoided by careful management of the federal case." Chico Serv. Station, Inc. v. Sol P.R. Ltd., 633 F.3d 20, 32 (1st Cir. 2011). The court must apply the Burford abstention doctrine narrowly, and only in "unusual circumstances, where the federal court risks usurping the state's role as the regulatory decision-making center." Forty Six Hundred, 15 F.4th at 75 (internal quotation marks omitted).

With respect to the first factor—and Soscia's arguments notwithstanding—Rhode Island courts are available to hear the claims it brings here.[13] Thus, timely and adequate state-court review is available. With respect to the second and third factors for Burford abstention, however, the defendants have not shown that this case has the potential to interfere with Rhode Island administrative policymaking or that this case would conflict with proceedings in Rhode Island.

Defendants argue that Soscia's claims here will require this court to address the term "historic use" in the context of the Permitting Act, which will cause the

_____

[13] As noted above, defendants assert that Soscia filed a tort claim in state court that overlaps with the claims asserted here and cites "Soscia v. RIDEM, P.C.-2021-07254." Doc. no. 34-1 at 21. Defendants did not append a copy of the pleadings in that case or provide any additional information. It is unclear whether that is the state court case that defendants assert Soscia "abandoned." Id. at 19.

27

court to become a regulatory decision-maker for Rhode Island. They also assert that the claims interfere with Rhode Island's regulatory regime to protect land use under its police powers. Defendants point to no claim in this case, however, that will require the court to address the meaning or application of the term "historic use." Soscia is not asking the court to interfere in a regulatory scheme based on policy or asking the court to interpret or change the Permitting Act. Instead, Soscia challenges the constitutionality of defendants' enforcement of the Permitting Act. Defendants have not shown that an exceptional circumstance exists here to support Burford abstention.

### B. Pullman abstention

Defendants next argue that the court should abstain based on the Pullman abstention doctrine. Pullman abstention is limited to cases where the claims turn on the meaning of ambiguous state law. Batterman v. Leahy, 544 F.3d 370, 374 (1st Cir. 2008). Defendants argue that Soscia's claims here depend on the meaning of the Permitting Act. Defendants have not identified an ambiguity, however, that would be dispositive of the claims. Therefore, defendants have not persuaded the court that Pullman abstention applies here.

## V. Summary of Rulings

The federal claims, Counts I-IV, are dismissed except to the extent they are brought against Chopy and Gray in their official capacities and seek only prospective injunctive relief. Count VII is dismissed. The court will not abstain from considering the remaining claims. The claims remaining in the case are

Counts I-IV against Chopy and Gray in their official capacities for prospective injunctive relief, Count V, and Count VI.

Defendants also moved to dismiss all of the claims on the merits as failing to state cognizable claims. The court has now dismissed Count VII and resolved the jurisdictional and quasi-jurisdictional issues thereby winnowing down the remaining federal claims. Defendants should present their challenges to the merits of the remaining claims after accounting for the rulings herein and after a careful examination of the remaining claims as pleaded.[14]

Defendants may challenge the merits of the remaining claims in a second motion to dismiss if filed within 30 days of the date of this order or, alternatively, in a properly supported motion for summary judgment. Soscia will have the applicable time provided under the rules to respond.

## CONCLUSION

For the foregoing reasons, the court grants in part and denies in part defendants' motion to dismiss (doc. no. 34). The court dismisses Counts I-IV except to the extent they state claims against David Chopy and Terrence Gray in their

---

[14] For example, it appears that defendants addressed the wrong contract in moving to dismiss Soscia's claim in Count I that enforcement of the Permitting Act violates the Contract Clause. See doc. no. 34-1 at 30-31. The parties should address in more detail the issue of whether the State of Rhode Island granted Quidnick a "franchise" through the 1846 Act, and if so, what the franchise conveyed to Quidnick. The parties should also focus on what rights and property Soscia purchased from Quidnick through the purchase and sale agreement and quitclaim deed and whether resolution of that question presents a factual or legal issue. See, e.g., Hall v. Nascimento, 594 A.2d 874 (R.I. 1991). Further, the relevance of the Mill Dam Act in this case must be better developed.

official capacities and seek prospective injunctive relief.  The court dismisses Count

VII.  The remainder of the motion is denied without prejudice as provided above.

SO ORDERED.

_____
Landya B. McCafferty
United States District Judge
Sitting by designation.

June 15, 2023

cc:    Counsel of Record